**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 1, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

TOBY HARMON; SHANE DODSON;
TAMMI DODSON,

      Plaintiffs - Appellants,

v.

CITY OF NORMAN, OKLAHOMA;
JEFF ROBERTSON, in his individual
capacity acting as a police officer for
the City of Norman, Oklahoma; DOES
1-5,

      Defendants - Appellees.

No. 22-6019

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:18-CV-00688-HE)**
_____

Submitted on the briefs[*]:

David J. Markese and Frederick H. Nelson of the American Liberties Institute,
Orlando, Florida, and Brently C. Olsson of the Cheek Law Firm, PLLC,
Oklahoma City, Oklahoma, for Plaintiffs – Appellants.

Kathryn Walker, City Attorney; Rickey J. Knighton II, Assistant City Attorney;
and Jeanne M. Snider, Assistant City Attorney, of Norman, Oklahoma, for
Defendants – Appellees.

---

    [*] After examining the briefs and appellate record, this panel has
determined unanimously to honor the parties' request for a decision on the
briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).
The case is therefore submitted without oral argument.

_____

Before **BACHARACH**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

In this appeal, we affirm the district court's ruling upholding the constitutionality of the disturbing-the-peace ordinance from Norman, Oklahoma. Longtime demonstrators outside the Abortion Surgery Center in the City of Norman, Appellants contend that the ordinance is unconstitutional both facially and as applied to their demonstrations. But as the district court ruled, Appellants failed to furnish evidence that the ordinance is content-based, infected with religious animus, or enforced unconstitutionally. In fact, the record reveals the opposite: Norman police officers enforced the ordinance only when the demonstrators' speech became so loud or unusual that it breached the peace. We affirm the district court.

## BACKGROUND

### I.    Factual Background

In the early 1970s, the City of Norman enacted a disturbing-the-peace ordinance, § 15-503. The ordinance has five subsections, which have remained intact over the years:

No person shall disturb the peace of another by:

(1) Violent, obstreperous, or improper conduct or carriage which in its common acceptance is calculated, or where the natural

consequence is to cause an assault, battery or other breach of the peace;

(2) Unseemly, obscene, offensive, insulting or abusive language which in its common acceptance is calculated, or where the natural consequence is, to cause an assault, battery, or other breach of the peace;

(3) Playing or creating loud or unusual sounds;

(4) Circulating literature which casts ridicule upon any deity or religion, which in its common acceptance is calculated to cause an assault, battery, or other breach of the peace;

(5) Displaying any sign, emblem, badge, flag or other device, which in its common acceptance is calculated, or where the natural consequence is, to cause an assault, battery, or other breach of the peace.

App. vol. 1, at 178. The ordinance does not define the terms used in these subsections, including what qualifies as "offensive" or as "loud or unusual sound[]." *Id.*

Toby Harmon, Shane Dodson, and Tammi Dodson (the demonstrators) are members of a sidewalk ministry. As part of that ministry, they "attempt[] to share a message with signs, tracts and speaking to the general public." *Id.* at 21. In their words, they engage in unsolicited "preaching" to visitors at abortion clinics by "talk[ing] with them about God's love" and "persuading" them against abortion. App. vol. 4, at 688. The demonstrators also display signs that depict a "Bible verse" and others that depict "a baby inside a mother's womb." *Id.* at 693. They distribute literature that includes "scripture from the Bible." *Id.*

3

For years, the demonstrators have proselytized on a sidewalk about thirty feet from the Abortion Surgery Center in Norman. The district court found that Shane demonstrated outside the clinic more than 100 times, and Shane testified that he preached "[o]n average, four times a month" from 2015 to 2019. *Id.* at 691. Tammi testified that the ministry has been preaching outside the clinic since 2014 or 2015.

Videos exchanged between the parties in discovery reveal that Shane's preaching often invoked religious themes, including messages about Jesus' teachings, biblical judgment, God's blessings, and repentance. The videos also reveal that Shane had amplified his preaching to visitors of the abortion clinic with a blue plastic cone. In one video, a ministry demonstrator stated that the visitors "can hear us" inside the clinic. In another, a ministry demonstrator stated that an off-duty Norman police officer was inside the clinic. Later in that same video, Shane began to preach, unabated, by shouting through his curled hand.

Some clinic visitors responded to the ministry's preaching with hand gestures and foul language. In one video, a ministry demonstrator claimed that a visitor gestured her hand in the shape of a gun toward him. Officer Jeff Robertson also testified that "many patrons and staff members" of the clinic "constantly complain[ed] about how offensive" and "obscene" the demonstrators' preaching was. App. vol. 2, at 231-32. But the record reveals no

violent encounters between ministry demonstrators and the clinic's visitors or staff.

Still, Norman police officers were no strangers at the sidewalk ministry. In materials submitted to the district court at summary judgment, the demonstrators claimed that officers repeatedly threatened to cite them under the ordinance. Their verified complaint alleges, for example, that "[f]or many years" the ministry had "been ordered to stop expressing their message pursuant to the Code's regulations." App. vol. 1, at 21.[1] Shane swore in response to interrogatories that officers twice told him to stop using a plastic cone to amplify his preaching into the clinic. Tammi also claimed in interrogatory responses that Norman police officers enforced the ordinance against her, but she could not recall specifics. *But see* App. vol. 3, at 553 (testifying that she did not "recall an instance where someone was told to stop expressing their message").

The record reveals that since 2014, Norman police officers have issued at least three citations under the ordinance. Just one relates to the demonstrators' preaching outside the clinic. On March 4, 2016, officers cited Harmon for violating the ordinance, which (among other restrictions) prohibits creating loud or unusual sounds that disturb the peace of another. The citation notes that

---

[1] Appellant Toby Harmon verified the complaint.

Harmon was using a "PA [public-address] system" to "disrupt[] the business."
App. vol. 1, at 172. Ultimately, Norman prosecutors dismissed the citation.

Apart from that citation, officers have cited non-party Katherine
Robinson under the ordinance, for "screaming" and "yelling" outside the clinic.
*Id.* at 175. But Norman did not approve that citation for prosecution. And
officers have cited Harmon for violating the ordinance for an incident near a
dentist's office and an ice-cream parlor on July 18, 2018. According to the
citation, Harmon pursued a woman to her car while "yell[ing] at her about an
abortion." *Id.* at 176.[2]

## II.   Procedural Background

The demonstrators filed a three-count complaint, seeking relief from the
City and Officer Jeff Robertson[3] under 42 U.S.C. § 1983. The complaint
asserted as-applied and facial challenges to the ordinance under the Free
Speech Clause, Free Exercise Clause, and the Due Process Clause of the U.S.
Constitution, and further alleged that Norman failed to train its police officers.

---

[2] No citation specifies which subsection of the ordinance the
demonstrators were cited under. Harmon's March 4, 2016 citation, for example,
notes that he violated "Section 15-503" and "10-307(3)." App. vol. 1, at 172.
Section 10-307 of the Norman Municipal Code (available online) prohibits
citizens from making certain noises, including operating a loudspeaker on
public sidewalks. The citation was later amended to drop the noise violation
under § 10-307. Because the citations all refer to the demonstrators' loud
speech, we assume that officers issued these citations under § 15-503(3).

[3] Except as noted, we will refer to Appellees as "the City." We refer to
the City of Norman individually as Norman.

6

The complaint also requested preliminary and permanent injunctions to stop the City from enforcing the ordinance.

The district court denied the demonstrators' request for a preliminary injunction, and we affirmed. *Harmon v. City of Norman*, 981 F.3d 1141 (10th Cir. 2020). We saw no substantial likelihood of success on the merits for their as-applied First Amendment challenges. *Id.* at 1150. We reasoned that the ordinance was content-neutral and was narrowly tailored to serve Norman's legitimate and substantial interest in "protecting its citizens from unwelcome noise." *Id.* at 1148-49. We also rejected the demonstrators' request for a preliminary injunction based on their facial challenges, concluding that the district court did not abuse its discretion because the demonstrators were unlikely to show that the ordinance was vague or overbroad. *Id.* at 1150-54.

With the preliminary-injunction issue resolved and after discovery, Norman and Robertson separately moved for summary judgment. The district court granted in part and denied in part. It began by noting that the "motions leave much to be desired insofar as a properly supported summary judgment motion is concerned." App. vol. 3, at 590. It remarked that the motions' "articulation of the pertinent material facts" was "extraordinarily spare." *Id.* at 591. And it noted that the demonstrators' opposition briefs wrongly "assum[ed] that allegations in the complaint must be viewed as admissible proof, due to the complaint being verified." *Id.* (citing *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002)).

7

Despite the deficiencies in the briefing, the district court summed up the first material factual dispute as "whether the defendants violated plaintiffs' rights by applying the 'loud noise' portion of the ordinance, or threatening to apply it, to conduct involving artificially amplified or focused speech or loud yelling and screaming by plaintiffs." *Id.* at 591-92. The district court answered that the City had constitutionally applied the noise subsection, § 15-503(3), to the demonstrators under either the Free Speech Clause or the Free Exercise Clause.

As to the demonstrators' Free Speech Clause claim, it concluded that "[t]he undisputed evidence establishes that the City's focus was the level of noise—the loudness of plaintiffs' comments—not the content." *Id.* at 592-93. And it concluded that the undisputed evidence showed that "plaintiffs were free to continue their demonstrations and preaching outside so long as they did not get so loud as to be audible inside the facility." *Id.* at 593. Thus, the district court dismissed the demonstrators' Free Speech Clause claim. *Id.* at 594. As to the demonstrators' Free Exercise Clause claim, the district court similarly reasoned that the undisputed evidence revealed that § 15-503(3) was both neutral and generally applicable. *Id.* at 594-95. It therefore concluded that the subsection survived rational-basis deference. *Id.* at 595.[4]

---

[4] In a footnote, the district court also dismissed the demonstrators' failure-to-train claim, remarking that "the verified complaint does not appear to

8

Turning next to the demonstrators' facial challenges to each subsection of the ordinance, the district court denied summary judgment. It noted that the City's and Robertson's "motions make little effort to address the facial claims." *Id.* at 596. Even still, the district court commented that it had "considerable doubt whether plaintiffs can establish facial invalidity of the ordinance given the exacting standards which apply to such claims." *Id.* But to be safe, the district court allowed the demonstrators' facial claims to proceed to a bench trial. *Id.* at 596-97.[5]

So the demonstrators went to trial solely on their facial challenges. At a half-day bench trial, the demonstrators called Shane as their sole witness. Our review of the trial transcript reveals that Shane largely reiterated his prior deposition testimony and the prior sworn statements in the verified complaint. But Shane also testified that Norman police officers had not threatened to cite either him or his wife, aside from when the pair used the plastic cone to amplify their voices.

The district court issued a ruling soon after the bench trial on the demonstrators' facial challenges. *Harmon v. City of Norman*, No. CIV-18-0688, 2022 WL 329235 (W.D. Okla. Jan. 7, 2022). For these, it distinguished between

---

even assert such a claim, at least as a separate or freestanding claim." App. vol. 3, at 588 n.2.

[5] The court ordered a bench trial because it dismissed "all claims which might support a damages recovery," leaving "only claims potentially warranting declarative or injunctive relief." App. vol. 3, at 597.

the four subsections in § 15-503(1), (2), (4), and (5) and the noise subsection,

§ 15-503(3). *Id.* at *3. The district court ruled that the demonstrators lacked

Article III standing to bring facial claims under § 15-503(1), (2), (4), and (5).

*Id.* at *2. That was because the demonstrators

> have never been cited for those subsections of the ordinance, have expressed no desire to engage in conduct that would violate those subsections, and have not presented evidence that they are being prevented from engaging in such conduct due to the threat of enforcement of those subsections of the ordinance.

*Id.*

Next, the district court rejected the remaining facial challenge to

§ 15-503(3). Relying on an Oklahoma case upholding a similarly worded Tulsa

ordinance, the district court concluded that "Norman's ordinance is not

overbroad or vague, nor does it prevent plaintiffs from conducting their

sidewalk ministry." *Id.* at *3 (citing *Howard v. City of Tulsa*, 712 P.2d 797

(Okla. Crim. App. 1986)). The district court likened Norman's ordinance to

Tulsa's. *Id.* In *Howard*, an Oklahoma appellate court approved the Tulsa

ordinance because "sounds with volume sufficient to disturb the peace inside a

residence was 'sufficiently a matter of common knowledge so that an average

citizen can determine with reasonable certainty what conduct is proscribed.'"

*Id.* (quoting 712 P.2d at 798).

The demonstrators timely appealed.[6]

---

[6] The City does not cross-appeal the district court's denial of summary judgment.

10

## JURISDICTION

We have jurisdiction to consider this appeal under 28 U.S.C. § 1291. *See Weise v. Casper*, 593 F.3d 1163, 1165 (10th Cir. 2010).

## STANDARD OF REVIEW

The demonstrators appeal the district court's grant of summary judgment and its rulings after the bench trial. "We review a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) (citation omitted). And "[i]n an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions *de novo*." *Lippoldt v. Cole*, 468 F.3d 1204, 1211 (10th Cir. 2006) (citations omitted).

## DISCUSSION

The demonstrators charge the district court with several errors. We proceed as follows. We first consider the district court's grant of summary judgment for the City, respectively addressing the demonstrators' as-applied challenges to § 15-503(3) and the failure-to-train claim. We then consider the district court's bench-trial rulings on the demonstrators' facial challenges to each subsection of the ordinance.

**I.    The district court did not err in granting summary judgment for the City on the demonstrators' as-applied challenges and failure-to-train claim.**

We begin our analysis by reviewing the district court's grant of summary judgment for the City. The demonstrators assert that the district court wrongly granted summary judgment despite genuine issues of material fact.

Before turning to the merits of the demonstrators' position, we note that we share the district court's misgivings about the deficiencies in the parties' factual presentations below. That problem persists on appeal because, "although our review is de novo, we conduct that review from the perspective of the district court at the time it made its [summary-judgment] ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

To that end, to show a genuine issue of material fact, the demonstrators must point us to admissible evidence enabling the court to rule in their favor on at least one of their claims. *See* Fed. R. Civ. P. 56(c); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) ("The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." (citation omitted)). Providing proof of genuine disputes is especially important on appeal because the demonstrators must ultimately convince us that they have a viable § 1983 claim that the district court prematurely dismissed. *Matsushita Elec. Indus. Co. v. Zenith*

12

*Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the [party claiming injury], there is no genuine issue for trial." (internal quotation marks and citation omitted)).

In arguing that the district court disregarded genuine issues of material fact, the demonstrators point to some of their complaint allegations as well as the City's supposed failure to support its merits defenses. Neither helps much in defeating summary judgment on appeal. For one, complaint allegations— even if verified[7]—are often unadorned conclusions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (noting that the nonmoving party "may not rest upon the mere allegations or denials of his pleading[s]" to avoid summary judgment). Indeed, we already considered those complaint allegations in ruling that the demonstrators were unlikely to succeed on the merits of their as-applied claims. *Harmon*, 981 F.3d at 1150. Nor do the demonstrators get far by focusing on the quantum of the other side's evidence—it is the demonstrators who bear the ultimate burden of proof on their § 1983 claims.

---

[7] The demonstrators urge that the verified complaint is admissible proof based on their personal knowledge. But this sort of evidence is not worth much in opposing summary judgment. *See Adler*, 144 F.3d at 671-72 ("The conclusory allegations in Plaintiff's complaint, although verified, are of as little help in carrying her burden under Rule 56(e) as are the conclusory arguments in her brief." (citations omitted)).

**A.    As applied, § 15-503(3) does not violate the First Amendment.**

The demonstrators argue that § 15-503(3) is unconstitutional under the Free Speech Clause and the Free Exercise Clause as applied to them. Distinguishing between facial and as-applied challenges, we have noted that "[a] facial challenge considers the restriction's application to all conceivable parties, while an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case." *iMatter Utah v. Njord*, 774 F.3d 1258, 1264 (10th Cir. 2014) (citation omitted). Though the same substantive standard applies to both facial and as-applied challenges, the latter demands "a developed factual record and the application of a statute to a specific person." *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc). To succeed on First Amendment as-applied challenges premised on viewpoint discrimination, plaintiffs "must show that [they were] prevented from speaking while someone espousing another viewpoint was permitted to do so." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014).

**1.    As-Applied Free Speech Clause Claim**

We begin with the demonstrators' as-applied claim under the Free Speech Clause of the First Amendment. Under the First Amendment, the government may not "abridg[e] the freedom of speech." U.S. Const. amend. I. The First Amendment applies to the States through the Fourteenth Amendment's Due Process Clause. *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 35 (10th Cir. 2013) (citations omitted). That includes municipal legislative enactments like

14

the ordinance here. *Hawkins v. City & County of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999).

The issue is whether the demonstrators have a First Amendment right to preach loudly on a sidewalk outside an abortion clinic. We answer this question by asking three of our own: Does the First Amendment protect the demonstrators' speech? If so, what is the nature of the forum where the speech occurs? And, depending on the forum, what are the City's justifications for restricting the speech? *See Summum v. City of Ogden*, 297 F.3d 995, 1001-03 (10th Cir. 2002). The parties do not dispute that the demonstrators engaged in protected speech or that the demonstrators' sidewalk ministry operated in a public forum.[8] We thus focus on whether the government was justified in restricting the demonstrators' loud speech under § 15-503(3).

In public fora, "the government may impose reasonable restrictions on the time, place, or manner of protected speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Those restrictions are reasonable if they (1) "are justified without reference to the content of the regulated speech," (2) "are narrowly tailored to serve a significant governmental interest," and (3) "leave open ample alternative channels for communication of the information." *Id.*

---

[8] Indeed, sidewalks are "'public places' historically associated with the free exercise of expressive activities." *United States v. Grace*, 461 U.S. 171, 177 (1983) (citing *Perry Educ. Ass'n v. Perry Loc. Educator's Ass'n*, 460 U.S. 37, 45 (1983)).

(quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). We consider each in turn.

a.    Content Neutrality

We first assess whether the undisputed evidence shows that § 15-503(3) is content-neutral. The subsection prohibits "loud or unusual sounds." App. vol. 1, at 178. It is thus content-neutral on its face because it does not draw distinctions based on the content of the speech. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164-67 (2015) (concluding that a city ordinance that restricted political signs was facially content-based). On its face, § 15-503(3) addresses all loud or unusual speech, whatever the content. *Harmon*, 981 F.3d at 1148 ("Section 15-503(3)'s language is clearly content-neutral, prohibiting disturbing another's peace by making 'loud or unusual sounds,' without reference to the content of the noise." (citations omitted)).

But our inquiry continues even though an ordinance is facially content-neutral. A facially content-neutral regulation is unconstitutional if "the government has adopted a regulation of speech because of disagreement with the message [the speech] conveys." *Ward*, 491 U.S. at 791 (citing *Clark*, 468 U.S. at 295). "The government's purpose is the controlling consideration." *Evans v. Sandy City*, 944 F.3d 847, 854 (10th Cir. 2019) (emphases omitted) (quoting *Ward*, 491 U.S. at 791). In assessing that dispositive consideration, we look to evidence in the record for an explanation of why the government adopted the regulation. For instance, we've relied on statements by legislators

16

and concerned citizens about the passage of the regulation. *See id.* at 854-55. If that evidence bears out that the government's purpose is "unrelated to the content of the expression deemed neutral," we conclude that the government's regulation is content-neutral "even if it has an incidental effect on some speakers or messages but not others." *Id.* (quoting *Ward*, 491 U.S. at 791).

Nothing in the record suggests that Norman passed § 15-503(3) to regulate the content of the demonstrators' message, much less *any* message. As the district court concluded, "[t]he undisputed evidence establishes that the City's focus was the level of noise—the loudness of plaintiffs' comments—not the content." App. vol. 3, at 592-93. Our own review of the record confirms the district court's finding. From the few deposition snippets that we have in the appellate record (including from Norman's lawyer), we deduce no improper purpose. We acknowledge that the evidence establishing Norman's *proper* purpose is lacking. And we recognize that Norman may have passed § 15-503(3) due to expectations of encounters between rival groups with strongly held views on abortion: the Supreme Court handed down *Roe v. Wade*, 410 U.S. 113 (1973), in January 1973, and Norman adopted its ordinance in its 1972–1973 legislative term. But we will not speculate about whether Norman passed § 15-503(3) to regulate specific messages. We agree with the district court that the demonstrators raised no genuine issue of material fact over Norman's content-neutral purpose. *See Adler*, 144 F.3d at 678 n.5 ("Genuine

17

issues of material fact must be supported by more than a mere scintilla of evidence." (citations omitted)).

As evidence, the demonstrators point to the City's enforcement record of § 15-503(3). That's relevant, according to the demonstrators, because the Supreme Court warned that a government regulation "would not be content neutral if it were concerned with undesirable effects that arise from 'the direct impact of speech on its audience' or '[l]isteners' reactions to speech.'" *McCullen*, 573 U.S. at 481 (alteration in original) (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)). But as stated, the "*controlling consideration*" is Norman's legislative purpose for § 15-503(3), not the future enforcement of it. *Evans*, 944 F.3d at 854-56 & n.3 (noting that the appellant pointed to "no authority to support" the view that we should consider post-enactment legislative comments). In other words, the demonstrators can't rely on evidence that Norman police officers may have enforced § 15-503(3) in a content-based way. That's simply proof of "incidental effect[s] on some speakers or messages," which effects we have stressed "do[] not make a regulation content-based." *Evans*, 944 F.3d at 855 (collecting cases).[9]

---

[9] The demonstrators also misread the significance of *McCullen*. It's true that a government regulation would be content-based if "it were concerned with undesirable effects that arise from the direct impact of speech on its audience or listeners' reaction to speech." *McCullen*, 573 U.S. at 481 (cleaned up). But the point is that the demonstrators must show that *the ordinance* was concerned with the speech, not just that some listeners were offended by the speech. In other words, we would likely treat § 15-503(3) as content-based if Norman

We also note that the enforcement record of § 15-503(3) doesn't raise a genuine issue of material fact. That's because the undisputed evidence does not show that Norman police officers enforced § 15-503(3) in a content-based manner as applied to the demonstrators. Instead, the evidence shows that Norman police officers cited the demonstrators based on the auditory volume of the demonstrators' speech, not their message. The first citation against Harmon notes, for example, that he "was using a [public-address] system and disrupting the business." App. vol. 1, at 172. The next—occurring on private property unrelated to the abortion clinic—recited that Harmon "continued yelling things" and that he followed a woman to her car and "yell[ed]." *Id.* at 176. And officers issued another citation against a non-party demonstrator for "loud . . . screaming" and "yelling." *Id.* at 175. Even more to the point, one of the videos reveals that Shane preached as an off-duty police officer stood watch at the clinic; Shane was not cited under § 15-503(3). Thus, the actual enforcement record against the demonstrators does not create a genuine dispute of material fact. The record does not support a finding that Norman police officers enforced § 15-503(3) to regulate content.

    b.  Narrowly Tailored to Significant Government Interests

We next turn to the question of whether the undisputed evidence supports the district court's conclusion that § 15-503(3) is narrowly tailored to serve

---

desired to prevent its citizens from hearing pro- or anti-abortion views. But we have no evidence in the record to support that finding.

19

significant government interests. Norman has a significant government interest in "protecting its citizens from unwelcome noise." *Harmon*, 981 F.3d at 1149. The Supreme Court tells us that "[n]oise control is particularly important around hospitals and medical facilities during surgery and recovery periods." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 772 (1994). And more broadly, the Court has upheld a government interest in protecting citizens from "excessive noise" in traditional public fora, such as sidewalks. *Ward*, 491 U.S. at 796 (collecting cases).

We thus focus on § 15-503(3)'s fit. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Put differently, the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799. Here, "[w]e look 'to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve.'" *Evans*, 944 F.3d at 856 (quoting *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165 (2002)).

We conclude that § 15-503(3) strikes the appropriate balance. The City reports that it has a "legitimate and substantial interest in protecting its citizens from unwelcome noise." Resp. Br. 16. So, in this as-applied challenge, the

20

demonstrators must show that § 15-503(3) has substantially chilled their protected speech, however loud. *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014) (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 802-03 (1984)). The demonstrators cannot meet that burden. The record does not reveal any heavy-handed enforcement of § 15-503(3) by Norman police officers as applied to the demonstrators. The opposite is true: for years, the demonstrators were able to preach—even at amplified volumes—undeterred by § 15-503(3). The videos in the record confirm, for instance, that officers did not cite the demonstrators for preaching outside the clinic when amplifying their voices through a plastic cone or their rounded hands. Nor did anything stop the demonstrators from preaching at non-amplified volumes. *See Hill v. Colorado*, 530 U.S. 703, 726 (2000) ("[W]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal.").

The demonstrators try to raise a genuine dispute by arguing that § 15-503(3) is not narrowly tailored because it prohibits "any sound, no matter how faint" and because it prohibits "sound heard by anyone inside, not just patients." Opening Br. 28-29. But the demonstrators confuse their as-applied challenge for a facial one. In a facial challenge, we might consider hypothetical applications of the statute. *But see Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008) (noting that facial challenges are "disfavored"

21

because they "often rest on speculation" and risk "premature interpretation of statutes on the basis of factually barebones records" (citation omitted)). On this record, however, the officers never cited the demonstrators for whispering into an abortion clinic or murmuring their biblical views to non-patients. To the contrary, officers cited Harmon for using a public-address system and yelling at a woman sitting in her car. The demonstrators' argument is simply conjecture that we need not indulge in an as-applied challenge. *See Ward*, 491 U.S. at 800 (concluding that the Fourth Circuit erred by "hypothesiz[ing]" regulatory alternatives that "reflect nothing more than a disagreement with the city over how much control of volume is appropriate or how that level of control is to be achieved" (citation omitted)).

c.      Alternative Channels for Communication

We also reject that the demonstrators have identified a genuine issue of material fact by arguing that § 15-503(3) shuttered their sidewalk ministry. "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *Taxpayers for Vincent*, 466 U.S. at 812 (citations omitted). To determine whether alternative channels are adequate, we assess the speaker's ability to reach his or her target audience. *Ward*, 491 U.S. at 802.

22

As mentioned, the undisputed evidence reveals that § 15-503(3) did not deter the demonstrators' speech and that it would not apply to their non-amplified speech. The demonstrators dance around the record by contending that they "would" violate the subsection "if anyone in any building could hear the speech." Opening Br. 33. But we don't look to *if* something *would* happen in an as-applied challenge. As we concluded before, "that the City's 'limitations on volume may reduce to some degree the potential audience for [Plaintiffs'] speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate.'" *Harmon*, 981 F.3d at 1149 (alteration in original) (quoting *Ward*, 491 U.S. at 802)). What has happened already is that officers did not reflexively cite the demonstrators whenever they spoke; officers cited them only when they spoke too loudly. The demonstrators—one of whom preached outside the clinic more than 100 times—cannot now plausibly claim that the noise subsection left them with no alternatives for communication.

\*     \*     \*

The demonstrators lack evidence to show genuine disputes of material fact to prevail on their Free Speech Clause claim. We hold that § 15-503(3) is constitutional under the Free Speech Clause as applied to the demonstrators. The demonstrators have not shown that the subsection was content-based, insufficiently tailored, or fatal to their sidewalk ministry. We therefore affirm

the district court's dismissal of the demonstrators' as-applied Free Speech Clause claim.

### 2.    As-Applied Free Exercise Clause Claim

The demonstrators next assert that the district court erred in granting summary judgment on their Free Exercise Clause claim. The demonstrators devote two paragraphs in total to this argument and cite no supporting law. Those deficiencies alone are reason enough to affirm. *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief." (citations omitted)).

In any event, we conclude that the district court correctly granted summary judgment for the City on the demonstrators' Free Exercise Clause claim. "While the First Amendment provides absolute protection to religious thoughts and beliefs, the free exercise clause does not prohibit Congress and local governments from validly regulating religious conduct." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) (citing *Reynolds v. United States*, 98 U.S. 145, 164 (1878)). The inquiry turns on which level of constitutional scrutiny applies to government regulations that burden religious conduct. We apply rational-basis deference if a regulation is both neutral and generally applicable, even if that regulation incidentally burdens religious exercise. *Id.* (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 879

24

(1990)). Otherwise, we apply strict scrutiny. *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1232-33 (10th Cir. 2009) (citation omitted).

The district court determined that rational-basis deference applied because the demonstrators presented no evidence that § 15-503(3) was religiously motivated. We agree. An ordinance is neutral "so long as its object is something other than the infringement or restriction of religious practices." *Id.* (citation omitted). And an ordinance is generally applicable unless "it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (citation omitted). The demonstrators identify nothing in the record showing that City council members passed § 15-503(3) to infringe on religious views. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534-40 (1993) (concluding that a city ordinance was not neutral based on evidence that Hialeah legislators passed the ordinance to target the Santería religion). Nor do they identify evidence that Norman police officers allowed secular speakers to scream their messages while citing the ministry demonstrators for that same conduct.

So rational-basis deference applies. We assess whether § 15-503(3) "rationally relate[s] to a legitimate government interest." *Ashaheed v. Currington*, 7 F.4th 1236, 1243 (10th Cir. 2021) (citation omitted). It does. As mentioned, Norman has a legitimate interest in protecting its citizens from

25

unwelcome noise. And § 15-503(3) rationally relates to that end because it prohibits loud or unusual sounds that disturb the peace of another. *See Henderson v. McMurray*, 987 F.3d 997, 1005-07 (11th Cir. 2021) (affirming a district court's dismissal of the plaintiffs' Free Exercise Clause claim on rational-basis deference because the plaintiffs "do not allege that the City has barred them from proselytizing their belief in the sanctity of human life outside of abortion facilities, only that their task is more difficult in the light of the noise provision and the presence of abortion-rights advocates"). We affirm the district court's grant of summary judgment dismissing the demonstrators' Free Exercise Clause claim.

### B.     The demonstrators' failure-to-train claim against Norman fails.

Our precedent disposes of the demonstrators' failure-to-train claim.[10] "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993). As Robertson committed no constitutional violation, Norman cannot be liable for a purported failure to train.

---

[10] The demonstrators' complaint does not squarely allege a failure-to-train claim. The demonstrators cite some complaint allegations (under the header "General Allegations") to support this claim. Those allegations assert that Norman failed to implement policies to train its police officers on complying with the First Amendment. We don't rule today on the sufficiency of these allegations and instead assume that the demonstrators' complaint pleads a failure-to-train claim against Norman.

And even if the demonstrators could clear that hurdle, they'd immediately run into another one: nothing in the record establishes that Norman was deliberately indifferent. At best, the demonstrators point to inadequate First Amendment training for Norman police officers. That is not enough to show "a pattern of tortious conduct" or an "obvious potential for constitutional violations." *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) (citations omitted). Indeed, as the Supreme Court has remarked,

> [t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.

*City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989) (internal citations omitted). Particularly on this enforcement record of § 15-503(3), we agree with the district court that the demonstrators' failure-to-train claim must fail.

## II.    The district court did not err in its post-trial judgment rejecting the demonstrators' facial claims.

The demonstrators next appeal the district court's bench-trial rulings that the ordinance is not facially vague or overbroad. A facial challenge requires more proof than an as-applied challenge. That's because "[f]acial challenges seek to vindicate not only individual plaintiffs' rights but also those of all others who wish to engage in the speech being prohibited." *Faustin v. City & County of Denver*, 423 F.3d 1192, 1196 (10th Cir. 2005) (citation omitted).

Indeed, it's generally "harder to prevail on a facial challenge" because any constitutional application of the statute proves its constitutionality. *United States v. Cox*, 906 F.3d 1170, 1178 n.8 (10th Cir. 2018) (citation omitted). To win in the First Amendment context, a plaintiff must "establish that no set of circumstances exists under which [the ordinance] would be valid"; "that [the ordinance] lacks any plainly legitimate sweep"; or that it is "overbroad" because "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 948 (8th Cir. 2018) (citation omitted). And because facial challenges "push the judiciary towards the edge of its traditional purview and expertise," we have warned they are "strong medicine." *Ward v. Utah*, 398 F.3d 1239, 1246-47 (10th Cir. 2005) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973)).

We thus proceed cautiously, mindful that facial challenges demand "a most exacting analysis." *Id.* at 1247. Like the district court, we first address whether the demonstrators have Article III standing to assert facial claims under § 15-503(1), (2), (4), and (5) of the ordinance. We wrap up with the demonstrators' facial challenge to § 15-503(3).

### A.   The demonstrators lack standing to facially challenge § 15-503(1), (2), (4), and (5).

The demonstrators contend that they have Article III standing to challenge § 15-503(1), (2), (4), and (5). To recap those subsections:

28

No person shall disturb the peace of another by:

(1) Violent, obstreperous, or improper conduct or carriage which in its common acceptance is calculated, or where the natural consequence is to cause an assault, battery or other breach of the peace;

(2) Unseemly, obscene, offensive, insulting or abusive language which in its common acceptance is calculated, or where the natural consequence is, to cause an assault, battery, or other breach of the peace;

. . . ;

(4) Circulating literature which casts ridicule upon any deity or religion, which in its common acceptance is calculated to cause an assault, battery, or other breach of the peace;

(5) Displaying any sign, emblem, badge, flag or other device, which in its common acceptance is calculated, or where the natural consequence is, to cause an assault, battery, or other breach of the peace.

App. vol. 1, at 178. The demonstrators acknowledge that these subsections "have not yet been directly applied against them." Opening Br. 40-41. But they assert that they may facially challenge these subsections to avoid any chilling of their preaching. The district court rejected this argument, reasoning that "[the demonstrators] have never been cited for those subsections of the ordinance, have expressed no desire to engage in conduct that would violate those subsections, and have not presented evidence that they are being prevented from engaging in such conduct due to the threat of enforcement of those subsections." *Harmon*, 2022 WL 329235, at *2.

We agree with the district court that the demonstrators lack standing to facially challenge § 15-503(1), (2), (4), and (5). Start with the basics of

standing for claims alleging facial invalidity based on chilled speech. The demonstrators bear the burden for "[t]he constitutional requirements for standing, [which are] (1) an injury in fact, (2) a causal connection between the injury and the challenged act, and (3) a likelihood that the injury will be redressed by a favorable decision." *Rio Grande Found. v. City of Santa Fe*, 7 F.4th 956, 959 (10th Cir. 2021). Though standing is not an onerous burden for plaintiffs, standing for chilled-speech claims is "particularly delicate" because "the injury is inchoate." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (en banc). We thus developed a test for plaintiffs bringing chilled-speech claims:

> [P]laintiffs in a suit for prospective relief based on a "chilling effect" on speech can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

*Id.* at 1089 (emphasis omitted). In conducting this assessment, we have stressed that "evidence of past activities . . . lends concreteness and specificity to plaintiffs' claims, and avoids the danger that Article III requirements be reduced to the formality of mouthing the right words." *Id.*

But we need not dwell on the specifics of this test, because the undisputed evidence shows that the demonstrators' speech was not chilled by these four subsections. For one, the record does not bear out that Norman

30

police officers ever threatened the demonstrators with citations under these subsections. At her deposition, Tammi could not recall a single instance when police officers told her to stop preaching under the four subsections:

> Q: . . . Were [ministry demonstrators] told to stop expressing their message, or were they told to reduce the volume, to turn the volume down?
>
> A: Volume. I believe it was more volume.
>
> Q: Okay. Do you ever recall an instance where someone was told to stop expressing their message?
>
> A: When I was out there or at all?
>
> Q: What you have personal knowledge of, something that you witnessed.
>
> A: No.

App. vol. 3, at 553. Likewise, Shane testified that he was never contacted by law enforcement when preaching at the University of Oklahoma:

> Q: When you've been street-preaching on Campus Corner, have you been contacted by any law enforcement officers from the City?
>
> A: No.

*Id.* at 562-63. The record also reveals that the demonstrators were not deterred from preaching after filing their complaint. Here's one example from Shane's deposition:

> Q: . . . Since you filed the lawsuit on July 17th of 2018, have you been back to the Abortion Surgery Center to preach, protest, counsel?
>
> A: Yes.
>
> Q: Okay. How often?

A:    . . . It's been less than I used to because of my work. Maybe
      once every—on average, once every two weeks—two or
      three weeks. That's on average.

*Id.* at 562.

The demonstrators respond by pointing to Shane's trial testimony that

"he has not preached regularly at the clinic since 2019 and has not preached

there at all since 2021" and that "he modified his preaching practice." Opening

Br. 46. But we do not read the trial testimony as capaciously as the

demonstrators do. As stated, Shane's deposition testimony shows that Shane

slowed his preaching outside the clinic because of his job, not any threat of

enforcement. And the trial testimony supports that Shane changed his preaching

practices when officers threatened to cite him for amplifying his voice with the

plastic cone—that is, for violating *§ 15-503(3)*, not the other four subsections.

No dispute exists that the demonstrators have standing to challenge

§ 15-503(3).

Further, Shane's trial testimony buttresses our conclusion that no Norman

official threatened to cite the demonstrators under § 15-503(1), (2), (4), and

(5):

Q:    . . . During any of those occasions, other than what we've
      previously mentioned with regard to the plastic cone, has any
      police officer ever accused you or threatened you with a
      citation for violating any of the provisions in Section 15-503?

. . . .

A:    No.

32

Q:      . . . Do you know of any occasions when your wife has been with you—has she been threatened with an alleged violation of Section 15-503?

A:     No.

App. vol. 4, at 713.

We thus agree with the district court and hold that the demonstrators lack standing to bring facial-invalidity claims for § 15-503(1), (2), (4), and (5) of the ordinance. To have standing, the demonstrators must show at a minimum that the threat of enforcement of these subsections has plausibly deterred their abortion-related speech. Because the record shows the opposite, the demonstrators lack standing.

**B.     The demonstrators' facial challenges to § 15-503(3) fail.**

**1.     Vagueness**

We have noted two instances when ordinances are unconstitutionally vague. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Jordan v. Pugh*, 425 F.3d 820, 824-25 (10th Cir. 2005) (quoting *Hill*, 530 U.S. at 732). In analyzing an ordinance, we look to "the enactment's purpose, the harm it attempts to prevent, whether there is a scienter requirement, and the interpretations of individuals charged with enforcement." *Id.* at 825 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 110-14 (1972)). And in reviewing an ordinance's language, we must be cautious of the "limitations of the English

33

language" and ensure that the ordinance is "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *Broadrick*, 413 U.S. at 608 (quoting *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 578-79 (1973)).

Under these principles, § 15-503(3) is not unconstitutionally vague. Though the words "loud or unusual" are abstract, they have acquired sufficient meaning to put citizens of ordinary intelligence on notice. *See Kovacs v. Cooper*, 336 U.S. 77, 79 (1949) (concluding that a city ordinance that prohibited "loud and raucous" noises was not impermissibly vague because, "[w]hile these are abstract words, they have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden"). The Supreme Court has never required "perfect clarity and precise guidance" for "regulations that restrict expressive activity." *Ward*, 491 U.S. at 794. Nor does a regulation flunk the vagueness test simply by "the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved." *United States v. Williams*, 553 U.S. 285, 306 (2008). Indeed, several courts have reasoned similarly when

faced with void-for-vagueness challenges against disturbing-the-peace enactments.[11]

Nor does § 15-503(3) "encourage[] arbitrary and discriminatory enforcement." *Jordan*, 425 F.3d at 825. Here, we consider "the interpretations the court below has given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." *Grayned*, 408 U.S. at 110. And we see that Oklahoma state courts have concluded as we do in analyzing similar ordinances. For instance, in *Howard*, an Oklahoma appellate court analyzed a Tulsa ordinance that prohibited "disturb[ing] the public peace or quietude" by the "playing of any radio, phonograph or any musical instrument in any manner or in such volume . . . so as to annoy or disturb the quiet, comfort or repose of any person in any dwelling." 712 P.2d at 798. The court ruled that whether the volume was too

---

[11] *E.g.*, *State v. Johnson*, 542 P.2d 808, 810 (Ariz. 1975) (rejecting a facial challenge to Arizona statute that criminalized "loud or unusual noise," noting that the statute required evidence of "whether the noise would disturb a person of ordinary sensitivities"); *State v. Fitzgerald*, 573 P.2d 100, 103 (Colo. 1978) (rejecting vagueness challenge to Colorado criminal statute outlawing "unreasonable noise" because "[t]he void for vagueness doctrine does not require a statute to be so specific that it is under inclusive" (citation omitted)); *State v. Poe*, 88 P.3d 704, 722 (Idaho 2004) (rejecting vagueness challenge to criminal statute that outlawed "loud or unusual noise" even though "it fail[ed] to precisely quantify the level of such conduct necessary to disturb someone else's peace"; "[t]hat [level of conduct] will depend upon the circumstances"); *City of Seattle v. Eze*, 759 P.2d 366, 369 (Wash. 1988) (ruling that Seattle ordinance outlawing "loud or raucous behavior" was not "inherently vague").

loud was "sufficiently a matter of common knowledge so that an average citizen can determine with reasonable certainty what conduct is proscribed." *Id.*

And, as mentioned, the City's enforcement efforts have allowed the demonstrators to preach unabated when they were not using amplifiers. The videos show this. There, we see sidewalk ministers routinely yelling toward the clinic—often through their hands and sometimes through a plastic cone—with no police efforts to quell them. In fact, in one video, a police officer drives away after learning that ministry members were amplifying their voices with a plastic cone and not a "bullhorn." The demonstrators' sole citation at the clinic stemmed from Harmon's use of a public-address system. On these facts, common sense dictates—and indeed, has dictated—what constitutes loud or unusual sounds.

## 2.    Overbreadth

Similarly, we reject the demonstrators' overbreadth challenge. "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick*, 413 U.S. at 613 (collecting cases); *see also City of Houston v. Hill*, 482 U.S. 451, 458 (1987) ("Only a statute that is substantially overbroad may be invalidated on its face."). Thus, our first task is to assess "whether the enactment reaches a substantial amount of constitutionally protected conduct." *Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982). The demonstrators have the "burden to show, 'from the text of [the ordinance] and from actual

36

fact,' that substantial overbreadth exists." *United States v. Bruce*, 767 F.3d 1009, 1020 (10th Cir. 2014) (quoting *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)).

The demonstrators identify no constitutionally protected speech that a restriction on loud or unusual sounds substantially destroys. That's especially so on the actual facts here when Norman police officers allowed the demonstrators substantial leeway to express high-value abortion-related speech outside the clinic. Again, only when the speech became disruptive and amplified did officers intercede. The record thus does not convince us that the City must swallow the strong medicine of facial invalidity.

## CONCLUSION

The demonstrators fail to show that any error pervaded the proceedings below. We thus affirm the district court's grant of summary judgment on the demonstrators' as-applied claims and its bench-trial rulings on the facial claims.